**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**United States of America,**

**Plaintiff,**

**v.**

**Ixsael Rudolfo Tinajero (1),**
**Adrian Tinajero (2),**
**Alexander Sandoval (3)**

**Defendants**.

**Criminal No. 04-CR-36 (DSD/SRN)**

**REPORT & RECOMMENDATION**

---

Andrew Dunne, Esq., on behalf of Plaintiff

Kevin O'Brien, Esq., on behalf of Defendant Ixsael Rudolfo Tinajero

Sheila Scott, Esq., on behalf of Defendant Adrian Tinajero

John Brink, Esq., on behalf of Defendant Alexander Sandoval

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Defendant I. Tinajero's Motion to Suppress Statements (Doc. No. 23); Defendant Sandoval's Motion to Suppress All Electronic Surveillance (Doc. No. 34); Defendant Sandoval's Motion to Suppress Physical Evidence, Statements Made by Defendant or Identifications of Defendant Obtained as a Result of Any Illegal Searches, Seizures, Interrogations or Identification Procedures (Doc. No. 35); Defendant A. Tinajero's Motion to Suppress Evidence Obtained as a Result of Search and Seizure

(Doc. No. 42); and Defendant A. Tinajero's Motion to Suppress Admissions and Answers (Doc. No. 43). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.[1]

**1. PROCEDURAL HISTORY**

An indictment dated January 23, 2003, was filed against Defendants charging them each with one count of conspiracy to distribute and possess with intent to distribute in excess of five hundred grams of a mixture and substance containing a detectable amount of amphetamine, in violation 21 U.S.C. §§ 846 and 841(b)(1)(C).

At the criminal motions hearing, the following witnesses testified on behalf of the Government: Minnesota Bureau of Criminal Apprehension Agent Robert Nance and Benjamin Rittmiller, Commander of the Minnesota River Valley Drug Task Force.

The Court received the following exhibits in evidence:

1. Exhibit 1: Cassette recording of statement of Defendant I. Tinajero, 1/9/04;
2. Exhibit 2: Cassette recording of statement of Defendant A. Tinajero, 1/9/04;
3. Exhibit 3: Cassette recording of Defendant Sandoval, 1/9/04;
4. Exhibit 3-A: Video recording of Defendant Sandoval, 1/9/04;
5. Exhibit 4: Minnesota Department of Public Safety Impound Form for Crown Victoria; and
6. Exhibit 5: Minnesota Department of Public Safety Impound Form for Nissan Maxima.

---

[1]This matter is set to be tried before the Honorable David S. Doty, United States District Court Judge for the District of Minnesota, on April 6, 2004.

The Court permitted defense counsel to file supplemental material and the Government to respond. Defendant Sandoval filed additional memoranda in support of his motion to suppress statements and the Government responded and moved to supplement the record with a videotape of Defendant Sandoval's statement, marked as Government Exhibit 3-A. [2]

## III. FACTS

Minnesota Bureau of Criminal Apprehension Agent Robert Nance testified that his agency and the Minnesota River Valley Drug Task Force conducted an investigation in early 2004 of suspected narcotics dealing. Officers received information from a Confidential Informant ("CI") concerning a Hispanic male from the Sioux City, Iowa area named "Rudy" with whom he discussed the purchase of a pound of methamphetamine for $7500. The CI stated that he could introduce Agent Nance, acting undercover, to "Rudy" to purchase methamphetamine.

Under law enforcement's direction, the CI placed recorded phone calls to "Rudy," who indicated that the drug transaction would take place at the McDonalds in Worthington, Minnesota. "Rudy" raised the price of the sale by $500 because others might drive with him from Sioux City. Agent Nance testified that the names of the other defendants were not raised in these conversations, nor did "Rudy," identify the race or ethnicity of the "others" who might be traveling with him to

---

[2]Defendant Sandoval moves to suppress any statements on grounds that the Government failed to timely disclose the recordings. The Government vouches that it made these materials available to defense counsel. It appears that this information was inadvertently non-communicated and there is no evidence that the Government purposely withheld this information from defense counsel. When made aware that Defendants did not have the recordings, the Government disclosed the materials, and the Court permitted defense counsel to file additional memoranda or materials based on the review of the recordings. As to Defendant Sandoval's motion to suppress the statements on the grounds of untimely disclosure (Doc. No. 35), the Court recommends that it be denied.

Worthington.

On January 9, 2004, "Rudy" called the CI, telling him that he was already at the McDonalds in Worthington. Commander Benjamin Rittmiller of the Minnesota River Valley Drug Task Force conducted surveillance at the McDonalds, along with several other undercover officers. Prior to the arranged buy, officers identified two vehicles possibly connected to the transaction, a Nissan Maxima with Nebraska plates and a white Crown Victoria with Iowa plates, and radioed this information to the surveillance team. Commander Rittmiller knew that "Rudy" was a Hispanic male and officers conducting surveillance inside the McDonalds identified two Hispanic males, one of whom was later identified as Defendant A. Tinajero.

Agent Nance and the CI drove a pick-up truck to McDonalds, both wearing electronic wires. Upon their arrival, Agent Nance testified that he observed two out-of-state license plates in the parking lot and at least two Hispanic males associated with the cars.

The Nissan, driven by Defendant I. Tinajero, with Defendant Sandoval sitting in the passenger's seat, pulled behind the undercover pick-up truck. The Crown Victoria was approximately 15-20 yards away, unoccupied. Agent Nance observed Defendant I. Tinajero exit the Nissan and walk toward the undercover pick-up truck. Defendant Sandoval moved over to the driver's seat of the Nissan. At the same time, two Hispanic males, one of whom was Defendant A. Tinajero, exited McDonalds and walked toward the Crown Victoria. The CI exited the pick-up and met Defendant I. Tinajero outside the vehicles. The CI returned to the pick-up truck, telling Agent Nance that Defendant I.Tinajero indicated that the methamphetamine was "in the vehicle." Defendant I. Tinajero then walked in front of the undercover pick-up, then toward the Crown Victoria. He returned to the undercover pick-up truck

and entered the rear seat. The CI and Defendant I. Tinajero engaged in a short conversation in Spanish. Agent Nance testified that Defendant A. Tinajero also entered the backseat of the undercover truck, handing Defendant I. Tinajero a one pound vacuum packed, sealed plastic bag of methamphetamine, which had been concealed on Defendant A. Tinajero's person as he walked to the pick-up truck.

After the Tinajeros entered the undercover truck, a fourth person walked to the Crown Victoria, opened the door and appeared to remove an object before getting into the passenger seat of the Nissan Maxima. Shortly thereafter, the Nissan Maxima began exiting the McDonalds' lot, traveling to a nearby Casey's gas station.

Back in the pick-up truck, Defendant I. Tinajero gave the sealed plastic bag to Agent Nance, with whom he had a brief negotiation in English about the price. Agent Nance paid Defendant I. Tinajero $7500 and he counted the money while still in the backseat of the truck.

Agent Nance then gave a verbal arrest signal. Officers arrested Defendants Adrian and Ixsael Tinajero, performed a search incident to arrest and recovered the drug buy money.

When the Nissan Maxima was leaving the McDonalds' parking lot, Commander Rittmiller followed it and indicated that he would conduct a traffic stop. The Nissan Maxima, however, was already stopped at a gas pump, where Defendant Sandoval was about to pump gas. Commander Rittmiller arrested Defendant Sandoval and the fourth person, conducting a brief pat search. He testified that he felt a lump in Defendant Sandoval's coat pocket the size of a softball. Commander Rittmiller removed the object which was ultimately identified as a half pound of methamphetamine. While officers placed Defendant Sandoval under arrest, Commander Rittmiller searched the Nissan

Maxima, looking for additional evidence of illegal narcotics. He found a cell phone and some paperwork in plain view. Later, another agent conducted an inventory search of both the Nissan Maxima and the Crown Victoria after the cars had been towed. (See Govt. Exs. 4 and 5.)

Officers transported Defendants to the Nobles County Law Enforcement Center. During processing and searching there, officers found another half pound of methamphetamine on Defendant Sandoval's person.

**A. Ixsael Tinajero Interview**

Agent Nance interviewed Defendant I. Tinajero at the Nobles County Law Enforcement Center approximately two hours following his arrest. (See Govt. Ex. 1.) The interview took place in an interview room, with Agent Nance and the Defendant present, and lasted about 35 minutes. Agent Nance provided an oral Miranda warning. Prior to the interview, Defendant I. Tinajero indicated that he could speak and understand English, that he understood his Miranda rights in English and was willing to talk to law enforcement. During the interview, Defendant identified himself as "Rudy." Id. Agent Nance testified that Defendant I. Tinajero wrote some English, held a GED and is a U.S. citizen. Agent Nance stated that both he and Defendant I. Tinajero understood each other and Defendant I. Tinajero never asked for an interpreter. Agent Nance described the tone of the discussion as relaxed, with both participants seated and unarmed. Defendant I. Tinajero never asked for an attorney nor did he refuse to answer any questions. (Govt. Ex. 1.) Agent Nance testified that he did not induce Defendant to talk nor did he make any promises.

**B. Adrian Tinajero Interview**

Commander Rittmiller testified that he interviewed Defendant A. Tinajero within approximately

two hours of his arrest. The interview occurred in a room at the Nobles County Law Enforcement Center and another agent was also present. (See Govt. Ex. 2.) Because Defendant had limited understanding and speaking ability in English, the officers utilized a telephone translation service called Language Line. Commander Rittmiller testified that he had no difficulty hearing the interpreter, who translated Defendant's Miranda rights. Defendant indicated that he understood his rights and was willing to speak to the officers. (Govt. Ex. 2.) The interview lasted approximately 45 minutes and Commander Rittmiller described the tone as cooperative. The officers made no threats or promises to Defendant A. Tinajero. At no time did Defendant state that he did not understand, nor did he ever ask for an attorney or refuse to answer questions. Id.

**C. Defendant Sandoval Interview**

Commander Rittmiller and BCA Agent Brian Marquart interviewed Defendant Sandoval. Because Defendant Sandoval possessed limited English ability, the officers again utilized the Language Line telephone translation service. The interview lasted approximately 30 minutes, during which time the following exchange occurred:

Q: First, Alexander, you've been placed under arrest for controlled substance–do you understand that?
A: No.
Q: For drugs?
A: No.
Q: There was *[sic]* drugs found in your pocket of your coat?
A: Yes.
Q: And the other people have told us about what you've been involved in, okay?
A: (nods head affirmatively)
Q: Alexander, you have the right to remain silent, do you understand that?
A: No, I do not understand that.
Q: You have the right to remain silent–you don't have to talk to us; do you understand that?
A: Bien.

Q: Anything you say can and will be used against you in a court of law.

*[Colloquy between Defendant and Interpreter]*

Q: Verbal, I need a verbal...

*[Colloquy between Defendant and Interpreter]*

Interpreter:

He says, "anything he says will be used against us?" and I said it could be used against you.

Q: Yes.

*[Colloquy between Defendant and Interpreter]*

Interpreter:

Yes, yes, he knows this.

A: You have the right to talk to a lawyer and have him present with you, while you are being questioned.

*[Colloquy between Defendant and Interpreter]*

Interpreter:

He doesn't have a lawyer, why can you do this?

Q: For right now, I just need you to say whether you understand each thing. Do you understand that you have the right to talk to a lawyer?

A: Yes.

Q: If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.

*[Colloquy between Defendant and Interpreter]*

Interpreter:

He says he doesn't have any money.

Q: Okay, but do you understand that if you can't afford one, the government will give you one?

A: Okay.

Q: You can decide at any time to exercise these rights and not answer any questions or make any statements.

A: Okay.

Q: Do you understand each of these rights that I've explained to you.

A: A little bit, yes.

Q: Is there something you don't understand?

A: Yes, I do understand, but I don't know what to say. I understand, but I don't understand, I don't know what to say.

Q: Okay, you don't have to talk to us, or you can start talking to us and if there's a question you don't want to answer, you can say so.

A: Esta bien.[3]

Q: And if you decide to start talking to us and at some point want to stop, you tell us, and we'll

[3] The Interpreter did not translate this phrase in English, but when Defendant previously used this phrase in response to earlier questions, she translated it as "okay."

stop.
A: Okay.
Q: Having these rights in mind, do you want to talk to us now?
*[Colloquy between Defendant and Interpreter]*
Interpreter:
Yes, he wants to know what you have to say.

(Govt. Ex. 3.) The interview lasted approximately one hour, during which time Defendant Sandoval never indicated that he could not understand the translator, nor did he ask for an attorney or refuse to answer any questions. Commander Rittmiller described the tone of the interview as cooperative.

## I. DISCUSSION

### A. Suppression of Statements or Admissions

The Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify against themselves. U.S. Const. amend. V. Miranda warnings must be given before any interrogation of a suspect in custody may take place. Miranda v. Arizona, 384 U.S. 436, 460-61 (1966). Before the government may introduce in its case-in-chief an incriminating statement made by a defendant, it must prove a voluntary, knowing and intelligent waiver of the accused's rights under the Fifth Amendment. Id. at 475. An express waiver is not required; rather, courts will find an implied waiver where officers advise a defendant of his rights and the defendant voluntarily answers officers' questions. See North Carolina v. Butler, 441 U.S. 369, 375-76 (1979).

In assessing the validity of a waiver, courts analyze the totality of the circumstances surrounding the interrogation. See Moran v. Burbine, 475 U.S. 412, 421 (1986). A language barrier is one factor courts may consider in analyzing the totality of circumstances of a Miranda waiver. See, e.g., Sysouvong v. Meschner, 171 F.3d 614, 615-16 (8th Cir. 1999) (finding valid waiver by Laotian

immigrant defendant where Miranda warnings were repeated in both English and Laotian and defendant seemed to understand nature and effect of his actions), cert. denied, 528 U.S. 988 (1999).

To determine if a defendant's testimony was given voluntarily, courts must ask whether, in the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the will of the accused. See Haynes v. Washington, 373 U.S. 503, 513-14 (1963). The factual inquiry centers upon (1) the conduct of the law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure. See Mincey v. Arizona, 437 U.S. 385, 399-401 (1978).

The Miranda right to counsel only attaches when a suspect invokes the right during custodial interrogation by making clear and unequivocal request for counsel. See Davis v. United States, 512 U.S. 452, 458-59b (1994) (holding that defendant's statement, "maybe I should talk to a lawyer," was ambiguous and did not require officers to clarify); Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (finding no clear invocation of right to counsel because defendant's question, "Could I call my lawyer?" was ambiguous request for counsel), cert. denied, 534 U.S. 962 (2001).

**1. Defendant Sandoval**

Defendant Sandoval moves to suppress statements or admissions, arguing that because of an inadequate Miranda warning, he did not waive his rights to silence and counsel. He also moves for the suppression of all evidence seized and statements made, arguing that the officers lacked probable cause to believe he had committed a crime or lacked reasonable suspicion to believe that he was involved in criminal activity.

As to the Defendant's Miranda challenge, there is no dispute that Defendant Sandoval was in custody and subject to interrogation. Prior to the issuance of a Miranda warning, Defendant Sandoval

was asked if he was aware that drugs had been found in his coat pocket, to which Defendant responded affirmatively. The interviewing officer then asked Defendant if he was aware that others had informed the officers about 'what Defendant had been involved in.' While the Government contends that it is not improper to advise a defendant why he has been placed under arrest prior to an advisement of Miranda rights, these two questions went beyond that. Because Defendant's responses to these questions were given prior to a Miranda warning, the Court recommends that any admissions made in response to these two questions be suppressed.

Commander Rittmiller and Agent Marquart, having obtained the services of a Spanish language interpreter, then advised Defendant Sandoval of his Miranda rights, which were read first in English, then translated in Spanish. (Govt. Exs. 3 & 3-A.) While Defendant Sandoval contends that he did not understand the Miranda warning (Def. Sandoval's Supp. Mem. at 2), both the audio and video recordings make clear that the officers explained each part of the Miranda warning through the interpreter, pausing to ensure Defendant's understanding. Id. For example, after being advised that if he could not afford an attorney, one would be appointed prior to any questioning, Defendant Sandoval stated that he had no money. (Govt. Exs. 3 & 3-A.) Agent Marquart then confirmed Defendant's understanding that if he could not afford an attorney, that the government would provide one. When Defendant Sandoval stated that he understood these rights "a little bit," Agent Marquart asked him if there was something that he did not understand. Defendant Sandoval then stated, "I understand, but I don't understand, I don't know what to say."

Commander Rittmiller and Agent Marquart painstakingly explained that Defendant Sandoval was not obligated to talk to them, and that he could choose not to answer any questions, even if he

chose to answer others. As the Government notes in its responsive memorandum, the officers went "above and beyond the standard Miranda requirements" by explaining that Defendant Sandoval could stop the questioning at any time. ((Govt.'s Supp. Mem. at 7, citing United States v. Lares-Valdez, 939 F.2d 688, 690 (9th Cir. 1991) (defendant need not be warned of right to stop questioning or of option to answer some questions, but not others)).

As the dialogue above indicates, Defendant Sandoval understood his right to silence and his right to counsel. He waived both rights. At no time did Defendant Sandoval ask-- either ambiguously or unambiguously-- to speak with a lawyer. The interviewing agents made clear to him that if he could not afford to hire a lawyer, the government would appoint one to represent him, prior to any questioning. Miranda requires no further explication. Accordingly, the Court recommends that his motion to suppress on these grounds be denied.

Defendant Sandoval also moves for suppression of any statements based on lack of probable cause to believe that he had committed a crime or reasonable suspicion to believe that he was involved in criminal activity. The evidence shows that when the CI arranged the Worthington drug buy, Defendant I. Tinajero stated that others might be traveling with him and he therefore sought an additional $500 compensation. Investigating officers knew that Defendant I. Tinajero resided in the Sioux City, Iowa area, and surveillance at the Worthington McDonalds' parking lot noted two out-of-state license plates: a Nissan Maxima with Nebraska plates and a Ford Crown Victoria with Iowa plates.[4] Prior to the drug buy, officers observed Defendant Sandoval sitting in the passenger seat of the

---

[4]Sioux City, Iowa, borders on the state of Nebraska.

Nissan Maxima driven by Defendant I. Tinajero, then move to the driver's seat when Defendant I. Tinajero exited the car. With the drug buy underway and the Nissan Maxima exiting the McDonalds' lot, officers followed the car to the nearby gas station where they arrested and searched Defendant Sandoval. Given that Defendant I. Tinajero stated that "others" might travel to Worthington with him and that Defendant Sandoval sat next to him in the Nissan, officers had both probable cause and reasonable articulable suspicion regarding Defendant Sandoval's involvement. His motion to suppress based on lack of probable cause and reasonable suspicion should therefore be denied.

**2. Defendants Adrian and Ixsael Tinajero**

Both Adrian and Ixsael Tinajero also move to suppress statements. Defendant I. Tinajero moves for suppression, arguing that any statements were made without assistance of counsel and were not made freely and voluntarily due to the "coercive nature of the encounter with law enforcement officers." (Def. I. Tinajero's Mot. to Supp. Statements.)

The record reflects that Defendant Ixsael Tinajero waived his right to counsel and agreed to speak with Agent Nance. (Govt. Ex. 1.) As Agent Nance testified, he conducted the interview unarmed, in an interview room, with both men seated, within a few hours of Defendant's arrest. Agent Nance described the tone of the interview as relaxed, a characterization supported by the tape recording. Id. Agent Nance made no promises to Defendant I. Tinajero in exchange for testimony, nor did he make any threats. The Court thus recommends that Defendant I. Tinajero's motion to suppress be denied.

Defendant Adrian Tinajero moves to suppress his statement on grounds of violation of his right to counsel, that any statements were not given freely and voluntarily and that his arrest was unlawful,

lacking in probable cause and no exigent circumstances supported it. (Def. A. Tinajero's Mot. to Supp. Admissions and Answers.)

Commander Rittmiller and Agent Grochow conducted the interview with Defendant A. Tinajero, translated via Language Line Services. Commander Rittmiller testified that the interview lasted approximately 45 minutes and the tone of the interview was relaxed. Defendant waived his rights to counsel and agreed to speak with the officers. (Govt. Ex. 2.) He did not ask for an attorney at any time, nor did he refuse to answer any questions. During the interview, the officers made no threats or promises. Id.

As to whether probable cause supported Defendant A. Tinajero's arrest, when the CI arranged for the drug deal to take place, Defendant I. Tinajero indicated that others might accompany him to Worthington. Surveillance officers observed Defendant A. Tinajero inside the McDonalds prior to the drug deal. When Defendant I. Tinajero sat in the backseat of the undercover pick-up, Defendant A. Tinajero eventually joined them, handing his brother a sealed plastic bag of methamphetamine. After Agent Nance received the drugs and paid Defendant I. Tinajero, he gave a verbal signal which led to other officers placing Defendants under arrest.

Because Defendant I. Tinajero indicated others might join him, and, in fact, undercover officers in Worthington saw two vehicles with out-of-state Iowa and Nebraska plates in the parking lot, officers observed Defendant inside McDonalds prior to the drug deal, Defendant entered the undercover truck used for the drug deal, handed his brother a bag of methamphetamine, the officers possessed sufficient probable cause to arrest Defendant. Accordingly, the Court recommends the denial of Defendant A. Tinajero's motion to suppress statements based on lack of probable cause and/or exigent

circumstances.

**B. Suppression of Evidence Obtained as a Result of Search and Seizure**

Probable cause sufficient for a warrantless arrest exists when, at the time of arrest, the collective knowledge of the officers involved is sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense. United States v. Wajda, 810 F.2d 754, 758 (8th Cir. 1987), cert. denied, 481 U.S. 1040 (1987). A finding of probable cause is based on the "totality of the circumstances" viewed in light of the experience of trained law enforcement officers. Brinegar v. United States, 338 U.S. 160, 175-76 (1949).

After making a valid custodial arrest, police may conduct a warrantless search of the arrestee without having probable cause or reasonable suspicion to believe that the arrestee possesses weapons or evidence. See New York v. Belton, 453 U.S. 454, 461 (1981); Michigan v. DeFillippo, 443 U.S. 31, 35 (1979). A police officer's general need to disarm a suspect or to preserve evidence justifies such searches and their validity depends only on the legality of the prior arrest. See DeFillippo, 443 U.S. at 35 (search of defendant's shirt pocket upheld as incident to arrest for violation of ordinance requiring individual to produced identification when stopped by police for questioning about possible criminal behavior); United States v. Sloan, 293 F.3d 1066, 1069 (8th Cir. 2002) (search of defendant's purse upheld as incident to arrest because officers had probable cause to arrest when they observed her pick up known drug courier). A search conducted immediately prior to an arrest may also be justified as incident to arrest if the police had probable cause to arrest the suspect before conducting the search. See Rawlings v. Kentucky, 448 U.S. 98, 111 (1980); United States v. Marion, 238 F.3d 965, 967 (8th Cir. 2001) (dictum) (search of automobile before formal arrest was valid because officers'

knowledge of defendant's suspended driver's license provided probable cause to arrest before search).

When police make a valid arrest of the occupant of a vehicle, they may search the passenger compartment and any containers within it. See New York v. Belton, 453 U.S. 454, 462 (1981); United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1999). Also, pursuant to the automobile exception to the warrant requirement, officers may search vehicles if they have probable cause to believe that evidence of a crime or contraband would be found in the vehicle. California v. Acevedo, 500 U.S. 565, 580 (1991); United States v. Ross, 456 U.S. 798, 806 (1982). Finally, after lawfully taking custody of property, such as a vehicle, police may conduct a warrantless inventory search of the property to satisfy three purposes: (1) to protect the owner's property while it is in police custody; (2) to protect the police against claims of lost or stolen property; or (3) to protect the police from potential danger. See Colorado v. Bertine, 479 U.S. 367, 373 (1987); United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001), cert. denied, 534 U.S. 1116 (2002). The Supreme Court requires that an inventory search be conducted according to standardized criteria. Florida v. Wells, 495 U.S. 1, 4 (1990); Hartje, 251 F.3d at 776 (inventory search valid because officers followed department procedures for towing cars).

**1. Defendant Sandoval**

Defendant Sandoval moves to suppress evidence obtained as a result of search and seizure, arguing that he was seized without probable cause to believe he had committed any crime and without reasonable, articulable suspicion that he was involved in any criminal wrongdoing. (Def. Sandoval's Mot. to Supp. Physical Ev. at 1.) Also, Defendant argues that any evidence seized from his vehicle

should be suppressed, based on a lack of probable cause and the officers' failure to follow proper inventory search procedure. Id. at 2.

As discussed *supra*, officers had ample probable cause to believe that Defendant Sandoval was involved in criminal activity. His arrest therefore was based on sufficient probable cause and the searches of his person and the vehicle were proper searches incident to arrest. Defendant Sandoval also challenges the subsequent search of his person during booking procedures at the Nobles County Jail, arguing that officers found amphetamine during that search as a direct result of arresting him without probable cause. (Def. Sandoval's Mot. to Supp. Physical Ev. at 1.) Because the Court concludes that ample probable cause justified Defendant's arrest, the Court recommends the denial of Defendant Sandoval's motion to suppress the evidence found during the booking procedure.

Finally, while Defendant argues that any evidence seized from the vehicle search should be suppressed for unlawful and unnecessary impoundment and failure to follow any established inventory procedure, the Court disagrees. Commander Rittmiller testified that although the Minnesota Valley Drug Task Force does not have a written procedure governing the impoundment of vehicles, it is standard practice to impound vehicles involved in controlled substance arrests. Officers followed that procedure and produced an inventory of their searches of both the Crown Victoria and Nissan (Govt. Exs. 4 & 5). See Hartje, 251 F.3d at 776 (inventory search valid because officers followed department procedures). Accordingly, the Court recommends that Defendant's motion be denied.

**2. Defendant A. Tinajero**

Defendant Adrian Tinajero moves to suppress all evidence on the grounds that any searches were done without a warrant, without probable cause and lacking in any exigent circumstances. On the

contrary, the Court finds, for the reasons set forth *supra*, that sufficient probable cause existed for the search of Defendant. Officers directly observed Defendant's involvement in the drug buy. The Court recommends that his motion to suppress based on unlawful search and seizure be denied.

**C. Motion to Suppress Evidence of Electronic Surveillance**

Defendant Sandoval moves to suppress all evidence of electronic surveillance and any derivative evidence. Defendant Sandoval's one-sentence motion fails to provide any grounds for suppression, nor did Defendant make a factual showing at the criminal motions hearing that officers utilized illegal electronic surveillance. The Court therefore recommends that his motion be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED THAT:**

1. Defendant I. Tinajero's Motion to Suppress Statements (Doc. No. 23) be **DENIED**;

2. Defendant Sandoval's Motion to Suppress All Electronic Surveillance (Doc. No. 34) be **DENIED;**

3. Defendant Sandoval's Motion to Suppress Physical Evidence, Statements Made by Defendant or Identifications of Defendant Obtained as a Result of Any Illegal Searches, Seizures, Interrogations or Identification Procedures (Doc. No. 35) be **GRANTED, in part,** as to interview statements made prior to Miranda warning**; and DENIED, in part,** as to all other statements, post-Miranda statements, physical evidence or identifications of Defendant;

4. Defendant A. Tinajero's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 42) be **DENIED**;

5. Defendant A. Tinajero's Motion to Suppress Admissions and Answers (Doc. No. 43) be **DENIED.**

Dated: March 23, 2004

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation within 10 days after being served with a copy thereof. The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.